[Doc. No. 65]

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **IN THE MATTER OF THE COMPLAINT OF B&C SEAFOOD, LLC,** <br><br> **AS OWNER OF THE F/V TOOTS II, A 52' STEEL-HULLED FISHING VESSEL, FOR EXONERATION FROM, OR LIMITATION OF LIABILITY.** | Civil No. 18-1560 (RBK/JS) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the "Motion for an Order Increasing Security for the F/V Toots II" ("motion") [Doc. No. 65] filed by Sargasso Sea Inc. and Fairfield Maxwell Services, Ltd, as owners and operators of the M/V Oleander, (collectively "Claimants"). The Court received the opposition filed by B&C Seafood LLC ("Petitioner") [Doc. No. 75] and claimants' reply [Doc. No. 80]. The Court also received petitioner's sur-reply brief [Doc. No. 81] and the parties' letters addressing the admissibility of the sur-reply brief [Doc. Nos. 82, 83, 84]. The Court recently held oral argument. For the reasons to be set forth in this Memorandum Opinion and Order, claimants' motion is DENIED.

Background

This action arises out of a collision that occurred on or about October 6, 2017 between the F/V TOOTS II ("Toots II") and the M/V OLEANDER ("Oleander") while the Toots II was fishing in waters off the coast of New Jersey. See Compl. [Doc. No. 1]. The collision occurred when the bow of the Toots II struck the rear starboard side of the Oleander. See Dep. Tr. of Jesse Sullivan, 154-55. Petitioner purchased the Toots II and the fishing permit in question on September 5, 2011 for $950,000.00.[1] Mot. at 2.

After the collision, the Toots II was taken to Yanks Marine Shipyard in New Jersey. Opp'n at 4. Petitioner, through North Star Insurance Services LLC ("NSIS"), gave notice of claim to underwriters, and the marine surveying firm of Martin Ottaway Van Hemmen & Dolan ("MOVHD") was appointed to represent the underwriters' interest. Id. MOVHD's Kyle Antonini attended two surveys: one on October 10, 2017 and another on October 12, 2017. Id. On October 30, 2017, Mr. Antonini sent an email to NSIS's Casey Sylvaria and approved $188,330 for repair costs on the Toots II. Id. Further surveys were conducted on November 16 and 17 and MOVHD issued a November 18, 2017 "Second Supplemental

---

[1] The permit attached to the Toots II at the time of the collision contained fifteen permitted fisheries. These include two limited access permits: (1) Lobster permit valued at $20,000; and (2) Scallop permit valued at approximately $1,370,000. See Mot. at 2 n 2 and 4.

2

Advice" where Mr. Antonini reported further damages to the Toots II and concluded that the fair and reasonable cost of repairs total $450,259.10.[2] Id. at 5. The pre-casualty value of the Toots II was approximately $300,000. Opp'n at 3. Because the cost of the repairs exceeded the value of the vessel, petitioner abandoned the vessel to its underwriters who then sold it for $40,000 scrap value. Id. Two months after the collision, B & C Seafood sold the Toots II's fishing permit for $1,475,000.00 to a third party. Mot. at 3. Claimants allege, upon information and belief, that petitioner earned $20,717.85 on the voyage from fishing scallops. Id. As such, petitioner moved, and the Court granted, its motion to accept security for a value of the Toots II of $60,967.85.[3] See Doc. No. 5.

Petitioner commenced this action on February 5, 2018. See Compl. at 1. In the complaint, petitioner seeks exoneration or Limitation of Liability pursuant to 46 U.S.C. §§ 30505 and 30511 ("The Limitation Act" or "the Act"). In their answers to the complaint, claimants allege, among other things, that the security posted is inadequate, and the Court should order appropriate security to be filed. See Doc. Nos. 8, 13, 14, 15,

---

[2] Claimants argue the surveys conducted on November 16 and 17 are ex parte vessel surveys that should not be considered in determining the value of the Toots II after the collision.
[3] Petitioner reached this number by adding the $40,000 scrap value and the $20,717.85 in fishing profits from the day of the collision.

3

16, 17, 18, 19, 20, 25, 26. Claimants allege the fair market value of the Toots II after the collision was between $100,000 and $125,000. See Decl. of Michael L. Collyer ¶ 6. Claimants further allege the fair market value of the Toots II for purposes of the Limitation Act should include the fair market value of the fishing permits assigned to the Toots II at the time of the incident, valued at $1,370,000.00. Id. at ¶ 12. Claimants argue the fair market value of the Toots II for purposes of the Act should be $1,495,000.00 while petitioner argues the vessel had a value of $60,967.85. Mot. at 1. Alternatively, if the fishing permit is not included in the valuation, claimants argue the fair market value of the Toots II should be $125,000. Id. at 5. Last, petitioner filed a sur-reply brief [Doc. No. 81] without leave of court and claimants argue the Court should decline to consider the arguments presented therein.[4] See Doc. Nos. 82, 83, 84.

Discussion

The Limitation of Liability Act protects the right of vessel owners to limit their liability to the value of the vessel, provided that the events or circumstances giving rise to the damage occurred without the vessel owner's privity or

---

[4] In the interest of justice, the Court will consider all briefs filed by the parties.

4

knowledge. Under the Act, the owner of a vessel may limit its liability to the value of the vessel and any pending freight. 46 U.S.C. § 30505(a). The Act was designed to encourage investment and protect vessel owners from unlimited exposure to liability. Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438 (2001). A vessel's value for the purpose of determining the amount of a limitation fund is assessed at the end of the voyage during which the casualty occurred. Cody v. Phil's Towing Co., 247 F.Supp.2d 688, 693-94 (W.D.Pa. 2002) (citing In Re American Milling Co., 125 F.Supp.2d 981, 984-85 (E.D.Mo. 2002)).

In determining the value of the vessel for purposes of the Act, the Supreme Court has stated:

> the custom has been to include all that belongs to the ship, and may be presumed to be the property of the owner, not merely the hull, together with the boats, tackle, apparel, and furniture, but all the appurtenances comprising whatever is on board for the object of the voyage, belonging to the owner, whether such object be warfare, the conveyance of passengers, goods, or the fisheries.

The Main v. Williams, 152 U.S. 122, 131 (1894). The court in The Main also defined "pending freight" as the "earnings of the voyage." Id. Additionally, Benedict's admiralty treatise notes that "[a]ppurtenances, e.g., the traveling derrick of a scow or the outfit of a whaler, essential to the service on which the vessel was engaged at the time of the happening of the accident, are a part of the value to be surrendered or appraised." In re

5

Waterman S.S. Corp., 794 F.Supp. 601, 605-06 (E.D.La. 1992) (citing 3 BENEDICT ON ADMIRALTY, § 63, p. 7-22 (7th ed. 1983)). The treatise also notes that the value of the ship's stores must be included in the appraisal, but not the value of spare parts kept on shore. Id. The Supreme Court has also stated the ultimate measure of the value of a vessel for purposes of the Act is the fair market value of the vessel. Cody, 247 F.Supp.2d at 693-94 (citing Standard Oil of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155 (1925)).

Claimants argue petitioner's fishing permits should be included in the "value of the vessel" for purposes of the Act. Specifically, claimants argue the fair market value of the Toots II is $1.495 million dollars because the fishing permits are an appurtenance of the vessel. Mot. at 1. Claimants rely on case law that states that fishing permits are an appurtenance to a vessel for purposes of maritime liens. See Gowen, Inc. v. F/V Quality One, 244 F.3d 64 (1st Cir. 2001); see also Fuller Marine Services, 2015 U.S. Dist. LEXIS 128938 (D.Me. Sept. 24, 2015); PNC Bank Del. V. F/V Miss Laura, 381 F.3d 183 (3d Cir. 2004). Petitioner, on the other hand, argues that fishing permits should not be included in assessing the value of the vessel, therefore, its liability should be limited to $60,967.85 (scrap value of $40,000 plus $20,967.85 for value of the scallop catch aboard the Toots II at the time of the collision). See Pet'r's

Opp'n at 5 [Doc. No. 75]. The Court agrees with petitioner and finds that case law interpreting the Limitation of Liability Act as well as case law assessing the value of a vessel does not support the assertion that a fishing permit should be included as an appurtenance of a vessel for purposes of the Act.

In Cody, for example, plaintiff commenced an action under the Jones Act, 46 U.S.C. § 688 et seq., and General Admiralty and Maritime Laws of the United States, after his left foot was crushed between two barges. Cody, 247 F.Supp.2d at 689. Defendants filed motions pursuing a limitation of liability defense and the court was tasked with determining the value of defendant's vessel pursuant to the Limitation of Liability Act. Id. at 690. The court concluded it did not have enough facts to determine the value of the vessel; however, it provided a detailed explanation of what the court would consider in assessing the value. Id. at 694. The court stated:

> [The fair market value of a vessel] may be established by evidence of either the actual sale of the vessel or sales of comparable vessels at the approximate time and within the relevant market. Only if no market exists for the vessel or contemporary sales of like vessels are unavailable may other forms of evidence be used to set the fair market value. In all events the court is to ascertain the vessel's value by determining the "sum which, considering all the circumstances, probably could have been obtained for [the vessel] on the date of the [casualty]; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." Standard Oil, 268 U.S. at 155-56. Making this assessment is not governed by a talismanic formula, but instead is

7

> to be based upon "a reasonable judgment having its basis in a proper consideration of all relevant facts."

Id. at 694. Since petitioner's permits do not have to be sold with the vessel, Cody supports the notion that fishing permits are not appurtenances for purposes of valuing a vessel.

In In re Waterman S.S. Corp., a fire erupted in the engine room of the S/S Stonewall Jackson, killing six of the ship's crew. The claimants brought a motion to increase the limitation fund to include the value of stores, bunkers, cash, and other appurtenances on board at the time of the incident. In re Waterman S.S. Corp., 794 F.Supp. 601, 602. The court relied on the Supreme Court's holding in The Main and held that the value of the appurtenances on board at the time of the incident should be added to the value of the limitation fund. Id. at 606. The court agreed with the Supreme Court's holding in The Main that the limitation fund should include "all the appurtenances comprising whatever is **on board** for the object of the vessel." Id. at 605 (citing The Main) (emphasis added). In The Buffalo, a longshoreman was put to work on a vessel in an emergency situation and had his arm crushed by a moving wheel. The Buffalo, 154 F. 815, 816 (2d Cir. 1907). The issue for the Second Circuit Court of Appeals was whether a hoist that was on the vessel when the accident occurred should be included in assessing the value of the vessel for purposes of the

Limitation of Liability Act. Id. The court relied on the Supreme Court's decision in The Main and held that the hoist should be included in the value of the vessel since the decision in The Main intended to "cover what the owners have at risk on the vessel for the object of the adventure." Id. at 819. These cases evidence that physical objects are appurtenances, not permits or licenses.

The issue of whether a fishing permit is an "appurtenance" for purposes of the Limitation of Liability Act is a novel one. However, after reviewing the pertinent case law, the Court finds that fishing permits should not be considered in assessing the "value of a vessel" for purposes of the Act. In applying the court's reasoning in Cody, the Court finds that the Toots II's fair market value after the collision was $40,000 as it was the price a willing buyer in the market was willing to pay for the vessel after the collision. Further, the Court must add the $20,987.85 consisting of the profit earned during the voyage as pending freight.

Unlike the value of stores, bunkers, cash, and other appurtenances on board at the time of the incident in In re Waterman S.S. Corp., the fishing permits used by the petitioner are intangible objects that were not "on board" the vessel at the time of the collision. Further, as Benedict's admiralty treatise notes, the value of the ship's stores must be

9

included in the appraisal, but not the value of spare parts kept on shore. In re Waterman S.S. Corp, 794 F.Supp. at 605. In The Buffalo held that the hoist should be included as an appurtenance for purposes of the Act because it was on board the vessel at the time of the collision. These cases demonstrate there is a distinction between physical objects on board a vessel and objects not on board a vessel for purposes of determining what is an appurtenance under the Act. Fishing permits are intangible objects not on board a vessel, therefore, holding that fishing permits should be included as an appurtenance for purposes of the Act would be inconsistent with relevant case law.

Case law relating to maritime liens, the law claimants rely upon, is not applicable in the current context. Claimants rely mainly on Gowen and PNC Bank Del. for their assertion that the Court should include fishing permits as an appurtenance for purposes of the Limitation Act. See Mot. at 7; see also Gowen, Inc, 244 F.3d at 67-70; PNC Bank Del., 381 F.3d at 186. The Court finds Gowen and PNC Bank Del. are distinguishable from the case at hand given that they refer to valuation for purposes of maritime liens. Maritime liens were created to promote commerce by allowing suppliers to freely extend credit to ships but still be protected from shipowners escaping their

debts by sailing away without payment.[5] The Limitation of Liability Act, on the other hand, is intended to limit a vessel owner's liability by preventing exposure to unlimited liability. The Court, therefore, finds that the cases claimants rely on have a different goal in mind than the case at hand. Therefore, even though courts have considered fishing permits an appurtenance for purposes of maritime liens, the Court will not expand the definition of appurtenances to include fishing permits for purposes of the Limitation Act.

Further, it is not insignificant that the Limitation of Liability Act was passed by Congress in 1851 yet there is no case law that supports claimant's assertion that fishing permits should be included as an appurtenance in determining the value of a vessel pursuant to the Act. This is an indication claimants' argument is off base. The Court rejects claimants' argument that their motion must be granted in order to maintain "uniformity" within maritime law. Instead, following claimants' valuation would be inconsistent with the purpose of the Act and the Supreme Court's interpretation of the Act. The language used by the Supreme Court in interpreting

---

[5] See Raleigh P Watson, Understanding Maritime Liens, MARLIN (Mar. 27, 2018), https://www.marlinmag.com/maritime-liens/ (providing general information relating to maritime liens); see also Gowen, Inc., 244 F.3d at 67-68 (explaining why fishing permits should be considered appurtenances for purposes of maritime liens).

the Limitation of Liability Act reveals that the appurtenances meant to be included to value a vessel are those that are physically present on the vessel. The Supreme Court in The Main specifically stated that the value of the vessel includes appurtenances **"on board** at the time of the incident." The Main, 152 U.S. at 131 (emphasis added). Even though a copy of the fishing permit may have been on the vessel at the time of the collision, the value of the permit rests with the intangible right to fish which comes with it.

Claimants' argument that the value of the Toots II should be increased to $125,000 is rejected. Claimants base their argument on the initial survey that was conducted by MOVHD's Mr. Antonini on the Toots II which found there was $188,330 in damages. Claimants further argue the Court should not consider the second survey where it was determined the damages exceeded $400,000. The Court agrees with petitioner and the relevant case law which states that the lack of a joint survey is not fatal unless the party can demonstrate something specific which makes the survey unreliable. See Steelmark (USA). Inc. v. M/V Handy Explorer, 2002 WL 31640482, *3 (E.D.La. Nov. 20, 2002); see also Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128, 130 (5th Cir 1972). Further, claimants base their argument on the Declaration of Michael Collyer which is speculative as he never had the opportunity to survey the Toots

II himself. See Decl. of Michael L. Collyer [Doc. No. 65-8]. Therefore, nothing in the record leads the Court to conclude the additional survey that was conducted is unreliable and should not be considered.

Conclusion

In conclusion, the Court finds fishing permits should not be considered appurtenances for purposes of the Limitation of Liability Act. The Court also finds the fair market value of the Toots II after the collision was $40,000, not $125,000. The Court reaches this conclusion by considering the surveys conducted by MOVHD after the collision as well as the scrap value the vessel was sold for. Therefore, claimant's motion to increase the limitation fund from $60,967.85 to $1.495 million is DENIED.

ORDER

Accordingly, and for the foregoing reasons, it is hereby ORDERED this 11th day of December 2019, that claimants' "Motion for an Order Increasing Security for the F/V Toots II" [Doc. No. 65] is DENIED.

s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge